CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
1/24/20
JULIA C. DUDLEY, CLERK
BY: K. Dotson
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| KRISTYN M. LETT, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 5:18-cv-00071 |
| GREAT EASTERN RESORT MANAGEMENT, Inc., | ) By: Elizabeth K. Dillon<br>) United States District Judge |
| Defendant and Third-Party Plaintiff, | ) |
| v. | |
| WESLEY O. VENEY, | |
| Third-Party Defendant. | |

## MEMORANDUM OPINION

Krysten Lett alleges that Wesley Veney, a Licensed Massage Therapist employed at the Spa at Massanutten (Spa) by Great Eastern Resort Management, Inc. (GERM), committed a battery by unlawfully touching her body during a massage. GERM moves for summary judgment, for an order compelling a subpoena response from a non-party, and to exclude expert witnesses.

GERM's summary judgment motion requires the court to consider whether, as a matter of law, Veney was acting within the scope of his employment. The court concludes that Veney was not, and therefore, GERM cannot be held liable for the alleged battery pursuant to the doctrine of respondeat superior. As a result, the court will grant GERM's motion for summary judgment and deny the remaining motions as moot.

I. BACKGROUND

**A. Veney's Training and Employment at the Spa**

GERM employed Veney as a Licensed Massage Therapist at the Spa at Massanutten. Licensed Massage Therapists are governed by the Virginia Board of Nursing. To become a

Licensed Massage Therapist, Veney attended a massage school accredited by the State Council of Higher Education of Virginia, which offered a minimum program of 500 hours of instruction. He received extensive training in proper massage technique and draping through written and classroom instruction and actual demonstration and practice. He was required to pass his exams with a minimum 70% competency. He also passed the Licensing Examination of the Federation of State Massage Therapy Boards, or another exam deemed acceptable by the Virginia Board of Nursing, which covered massage knowledge, technique, and ethical boundaries, and had to demonstrate that he had not committed any act that would be grounds for disciplinary action or denial of certification. Massage therapists in Virginia are also governed by the Code of Ethics promulgated by the National Certification Board for Therapeutic Bodywork and Massage (NCBTMB). These ethics rules are taught and tested in massage school and as part of the licensing examination.

Once hired at the Spa, Veney received the Spa's job description for a massage therapist, the specific service protocols governing massages at the Spa, the Spa's "Standard of Practice" and "Team Manual," and the "Code of Ethics" given to clients. These documents set clear standards for Veney's employment. The job description required Veney to "maintain a professional and positive environment for clients," and to "perform and be proficient in all massage and spa services offered by the spa, following the specific protocol for each service." (Affidavit of Allison Thompson ("Thompson Aff.") ¶ 5, Ex. F, Dkt. No. 62-3.) The Code of Ethics provided, "massage therapists shall . . . respect each client's right to privacy . . . , conduct all business and professional activities within the scope of practice . . . ," and "refrain from engaging in any sexual conduct or sexual activities involving their clients." (Affidavit of Wesley O. Veney ("Veney Aff.") Ex. C, Dkt. No. 62-5.) The Employee Handbook provided: "Every employee is expected to conduct themselves in a responsible manner that reflects well on GREAT EASTERN. When engaged in any activity concerning GREAT EASTERN and when dealing with customers . . . , employees are expected to observe the

2

highest standard of integrity, honesty and fairness. Disciplinary action may be taken against any employee who engages in inappropriate conduct." (Thompson Aff. ¶ 6, Ex. G.) Veney acknowledged in writing that he had read and understood Massanutten's rules, policies, and regulations, had received a copy of the Employee Handbook, and that it was his responsibility to read and comply with all rules and policies.

The Spa's "Standard of Practice" requires massage therapists to comply with "regulations, standards of practice and codes of ethics set forth by the Virginia Board of Nursing, NCBTMB, and the American Massage Therapy Association." (Affidavit of Andrea Owens ("Owens Aff.") ¶ 7, Ex. B, Dkt. No. 62-6.) The Standard of Practice prohibits inappropriate touching and draping, and gives explicit requirements, including "use appropriate draping that . . . protects the client's privacy;" "never expose the gluteal line;" "the areola must be covered at all times and never touched;" and "massage only 1/3 of the way up from the knee." (Owens Aff. ¶ 8, Ex. B.) The Spa's "Hot Stone Therapy Protocol" and "Swedish Massage Protocol" provide additional, specific requirements for those massages, including proper draping and the areas of the body subject to massage. Resort spas like the one at Massanutten generally follow these types of set protocols for massages, and the Spa's specific protocols are consistent with ethical guidelines.

The NCBTMB and the Spa's Standards of Practice (which incorporates the NCBTMB standards) require massage therapists to engage in professional communication; solicit only information that is relevant to the professional/client relationship; and refrain from "sexual activity," which includes "flirtatious behavior." (Affidavit of Christine LaFrance ("LaFrance Aff.") ¶¶ 8, 10, Ex. D.) The Spa's job description for a massage therapist required Veney to maintain a professional environment, and the Employee Handbook required Veney to "observe the highest standard of integrity." (Thompson Aff. ¶¶ 5–6, Ex. F, G.)

Veney was required to "follow the specific protocol for each service." (Thompson Aff. ¶ 4, Ex. F.) He received additional instruction from a "Lead Supervisor" at the Spa, who was also a Licensed Massage Therapist, in the Spa's protocols and preferences for massages. Before seeing any clients, Veney performed two massages on the Lead Supervisor, with a focus on draping, technique, pressure, and familiarity with muscle groups, and demonstrated proper knowledge of draping, massage, and the Spa's protocols.

Veney performed massage services at the Spa from July 3, 2014, to August 28, 2014, when he performed the massage on Ms. Lett.

**B. Lett's Experience at the Spa**[1]

Lett visited Massanutten Resort from August 24–31, 2014, with her aunt. Before visiting the resort, Lett reviewed the Spa's website and the types of massages and services it offered, and she decided to get a hot stone massage. Lett recalled that the description of the hot stone massage "was more stones, less hands, relaxing atmosphere, relieve stress." (Lett Dep. Tr. 31:10–15, Dkt. No. 62-1.) She chose the hot stone massage because, "I don't really like for people to touch me a whole lot. So from what I read it sounded like there would be more stones than hands." (*Id.* at 31:18–23.)

Lett scheduled a massage for August 28, 2014. She arrived at the spa early for her appointment, checked in, and was given paperwork to review and fill out. The paperwork provided to Lett included an intake form and a front-and-back sheet with "Helpful Information" on one side and the "Code of Ethics" on the other. Although Lett does not remember whether she received this sheet at the Spa, she does recall reviewing the "Helpful Information" page online prior to her

---

[1] Veney denies committing an assault or battery (*see* Veney Aff. ¶ 8), but the court accepts Lett's version of events as true for purposes of deciding whether GERM is entitled to summary judgment on the respondeat superior issue.

4

massage. The Spa offered Lett a beverage choice. She chose a small glass of wine but was not intoxicated or impaired in any way.

Lett and several other people waiting for a massage were taken downstairs to the massage rooms where they met their massage therapists. Veney was Lett's massage therapist. They reviewed the intake form Lett completed, and Veney gave her a "general outline." Veney explained to Lett that she had the option of undressing completely or leaving her underwear on, and that she should get underneath the drape. Veney left the room and returned when Lett was under the drape.

Lett alleges in her Complaint that Veney "moved the drape, leaving [her] completely uncovered from the waist down," touched and fondled Lett in her pubic area, breasts, and anal area, and "kissed [her] on the mouth." (Compl. ¶¶ 44, 48, 50, 51, 54, Dkt. No. 1.) Lett alleged that she told Veney she preferred stones rather than a manual massage, but he ignored her statement. (*Id.* ¶¶ 42–43.)

In her deposition, Lett testified that she understood that a drape would cover her, and that only the part of her body being massaged would be uncovered. The "Helpful Information" sheet stated that the "therapist will undrape only the part of your body being massaged at any given time, ensuring that your modesty is respected." (Amanda Smith Dep. Tr. Ex. 2, Dkt. No. 62-2.) Consistent with the "Code of Ethics" sheet, Lett also understood that a massage therapist was not supposed to engage in any sexual conduct or activities with her; was not supposed to cause any harm to her physical, mental, or emotional wellbeing; was supposed to act in a professional manner; and was supposed to protect her privacy and respect her modesty, to include not touching or exposing her breasts or vagina.

Lett also testified that Veney flirted with her, which she did not expect to happen and understood was not a professional interaction. Lett stated that Veney "asked a lot of questions, personal questions about boyfriend, dancing, how long I was there, what I wanted to do," and

5

requested her phone number. (Lett Dep. Tr. 50:12–51:16, 62:8.) Lett testified that Veney commented on her nipple piercing (*id.* at 50:12–51:16), and she alleged that Veney asked if she "considered a vaginal piercing." (Compl. ¶ 52.) Lett also alleged that Veney asked her "whether she liked to salsa dance" and "repeatedly asked her out." (Compl. ¶ 46.)

Lett further testified that while she was lying face down on the massage table, Veney moved the drape and uncovered her entire body from the waist down. (Lett Dep. Tr. 57:19–58:5, 71:12–72:9, 76:17–25.) Lett did not expect to have her whole lower body uncovered. Lett testified that Veney proceeded to touch her inappropriately. (*Id.* at 53:17–22.) Veney, according to Lett, was focused entirely on her private parts. (*Id.* at 54:1–55:8, 81:2–9.) Lett testified that what occurred "wasn't . . . a massaging feeling." (*Id.* at 73:12–21.) She stated that Veney's touching was not "like the other massage techniques he used," and was done without as much "pressure." (*Id.* at 74:17–75:1.) Lett testified that this touching was not what she understood to be a normal massage and was performed with a "lighter" touch but also felt "deliberate." (*Id.* at 79:2–22.) Lett did not expect this type of touching and knew it was not consistent with respecting her modesty or privacy. When she returned to lying face up, Veney removed Lett's drape and fondled her breasts. (*Id.* at 54:1–55:8, 57:19–58:5, 60:5–16, 81:2–9 .)

Veney kissed Lett at the end of the massage. Lett understood the kiss was not acceptable conduct for a massage therapist. She believes the inappropriate touching of the private areas of her lower body lasted "approximately 15 to 20 minutes," and that Veney spent "a good while" focusing on those parts of her body. (*Id.* at 75:11–76:2.) The entire massage lasted about 45 minutes. (*Id.* at 75:11–12.) Lett considered other parts of the massage to be a legitimate massage on her arms, calves, and shoulders. (*Id.* at 79:7–11.) Except for her experience with Veney, Lett testified that she experienced a professional environment "[e]verywhere else" in the Spa. (*Id.* at 118:10–15.)

Lett complained about Veney to the spa manager later that day. The spa manager terminated Veney immediately and notified the Department of Health Professions. Veney denies touching Lett in an inappropriate manner, but he also states he engaged in personal conversation with her and kissed her because he felt a sense of attraction. He told the spa manager, "I thought she liked me." (Thompson Aff. ¶ 10; Veney Aff. ¶ 11.)

## II. ANALYSIS

### A. Motion for Summary Judgment

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), 56(e). All inferences must be viewed in a light most favorable to the non-moving party, but the nonmovant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

**B. Respondeat Superior**

In Virginia,[2] an "employer is liable for the tortious act of his employee if the employee was performing his employer's business and acting within the scope of his employment." *Parker v. Carilion Clinic*, 819 S.E.2d 809, 819 (Va. 2018). "In other words, there must be a nexus between the employee's workplace responsibilities and the offensive act." *Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d 140, 145 (4th Cir. 2018). An employee's act "falls within the scope of his employment only if (1) the act 'was expressly or impliedly directed by the employer, or is naturally incident to the business, and (2) it was performed . . . with the intent to further the employer's interest.'" *Id.* (quoting *Kensington Assocs. v. West*, 362 S.E.2d 900, 901 (Va. 1987)). Respondeat superior applies to intentional tort cases. *Roughton Pontiac Corp. v. Alston*, 372 S.E.2d 147, 149 (Va. 1988).

The Supreme Court of Virginia has recently emphasized that the typical formulation of the doctrine—that an employer is "liable for the tortious act of his employee if the employee was performing his employer's business and acting within the scope of his employment"—is a "low-resolution" statement that has led to "difficulties in its application" and often presents "conceptually vexatious and perplexing questions." *Our Lady of Peace, Inc. v. Morgan*, 832 S.E.2d 15, 22 (Va. 2019) (citing *Parker*, 819 S.E.2d at 819). "Acknowledging these criticisms," the court "sought to recapture the 'first principles' of respondeat superior and to eliminate some of the 'doctrinal vagaries' that had crept into our jurisdiction on this issue." *Id.* (citing *Parker*).

In *Parker*, the court stated that the "first principle of respondeat superior is that vicarious liability may be imposed on an employer when 'the *service itself*, in which the tortious act was done, was within the ordinary course of [the employer's] business,' i.e., when the employee

---

[2] The parties agree that Virginia law governs this diversity action.

8

committed the tort while 'performing a normal function' of his assigned job." *Parker*, 819 S.E.2d at 819 (quoting *Gina Chin & Assocs. v. First Union Bank*, 537 S.E.2d 573, 578 (2000)) (emphasis in original). In cases finding that vicarious liability could apply for an intentional tort, "the tortious act or transaction occurred *while* the employee was in fact performing a *specific job-related service* for the employer, and, but for the employee's wrongdoing, the service would otherwise have been within the authorized scope of his employment." *Id.* at 820 (emphasis in original).³ In "many cases, perhaps most, an employee's intentional torts are purely personal acts and thus not within the scope of employment." *Id.* (citing 2 Dan Dobbs et al., The Law of Torts § 429, at 796 (2d ed. 2011)).

Also relevant is the employee's motive in committing the tortious act. *See id.* at 821; *Our Lady of Peace*, 832 S.E.2d at 23. Liability cannot extend to an employer for an unauthorized tortious act by an employee arising "wholly from some external, independent, and personal motive on the part of the [employee] to do the act upon his own account." *Smith v. Landmark Commc'ns, Inc.*, 431 S.E.2d 306, 307–08 (Va. 1993). "[A] servant's tortious act 'is within the scope of employment if, but only if . . . it is actuated, *at least in part*, by a purpose to serve the master,' or, put another way, '[a]n employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve *any* purpose of the employer.'" *Parker*, 819 S.E.2d at 822 (emphasis in original) (citing Restatement (Second) of Agency § 228(1)(c) and Restatement (Third) of Agency § 7.07(2)). Generally, an employer

---

³ For example, in *Gina Chin*, vicarious liability could apply to a bank teller who deposited forged checks for his own gain because the employee was "performing a normal function of a bank teller in accepting checks for deposit." *Id.* (citing *Gina Chin*, 537 S.E.2d at 579); *see also Majorana v. Crown Cent. Petroleum Corp.*, 539 S.E.2d 426, 429 (Va. 2000) (reversing an entry of summary judgment against a claim that a gas station attendant committed a tortious act within the scope of his employment when he assaulted the claimant during a sales transaction); *Plummer v. Center Psychiatrists, Ltd.*, 476 S.E 2d 172, 174 (Va. 1996) (on demurrer, allegation that psychologist had sexual intercourse with patient sufficient to support conclusion that act was within scope of employment because it "was committed while he was performing his duties as a psychologist in the execution of the services for which he was employed").

9

committing an intentional tort does not do so with the intent to further the employer's interest. *See Gina Chin*, 537 S.E.2d at 577. An employee's motive can be determinative in cases where the bad motive is accompanied by a "deviation from the employer's business" that is "marked and unusual" as opposed to "slight." *Our Lady of Peace*, 832 S.E.2d at 23; *Gina Chin*, 537 S.E.2d at 578.

In *Our Lady of Peace*, the court observed that it is "possible to hypothesize" how "acts of touching, sexually abusing, and molesting" could occur while the employee—in that case a nursing home assistant—"was in fact performing a specific job-related service for the employer" and "while the employee was actively engaged in a job-related service," which included "undressing residents, changing their undergarments, as well as bathing them." 832 S.E.2d at 25. The job requirements of the nursing home assistant job in *Our Lady of Peace*, however, involved the touching of nursing home residents' private areas. Here, by contrast, Veney was not required to touch the private areas of people he was massaging; indeed, he was expressly forbidden from doing so. Unlike *Our Lady of Peace*, therefore, it cannot be said that the alleged battery occurred while Veney was performing a job-related service.[4]

In addition, the court finds that there is no fact issue as to Veney's motive, which was entirely personal and a "marked and unusual" deviation from the employer's business. *See Our Lady of Peace*, 832 S.E.2d at 23; *Gina Chin*, 537 S.E.2d at 578. As discussed in detail above, touching and massaging areas such as Lett's breasts and vagina is completely off limits and prohibited not only by the licensing regulations governing massages but also by the Spa's Standard of Practice. Indeed, GERM put forward affidavits from two Licensed Massage Therapists, both of

---

[4] As the court observed in a case involving sexual abuse of a minor by a church deacon, the "difficulty of proving this assertion" is "one of the reasons that '[p]laintiffs rarely succeed in their claims that a religious organization is vicariously liable for its agent's sexual misconduct.'" *A.H. by Next Friends C.H. v. Church of God in Christ, Inc.*, 831 S.E.2d 460, 477 n.19 (Va. 2019). As (quoting Ira C. Lupu & Robert W. Tuttle, *Sexual Misconduct and Ecclesiastical Immunity*, 2004 BYU L. Rev. 1789, 1880).

whom state that the conduct described by Lett is not part of standard massage practice or any service offered at the Spa. (LaFrance ¶ Aff. 15; Owens Aff. ¶ 14.) Veney's personal motive is reinforced by his affidavit, which states that he thought Lett liked him, that the kiss and other interest he showed in Lett was "personal," and that "nothing about his employment with the Spa led him to . . . act in an unprofessional manner toward her." (Veney Aff. ¶ 11.)

Lett points to *Our Lady of Peace* as requiring that a determination of whether sexual assault and even rape occur within the scope of employment must be made by the trier of fact. This is incorrect—at least in federal court. The outcome of the *Our Lady of Peace* decision was a reversal of the trial court's judgment because it "erred in removing the scope-in-employment issue from the jury based upon its ruling on Our Lady of Peace's plea in bar, which it later implemented through its ruling on the motion in limine and through its jury instruction." 832 S.E.2d at 28. The allegations in the complaint were all the evidence before the court on the plea in bar concerning the disputed issue of vicarious liability. *Id.* at 24. Put more simply, as a matter of Virginia procedure, the plaintiff was entitled to a jury determination on the respondeat superior issue. *See id.* at 26 ("Our prior precedent, however, dictates that we hold that the specificity of the original complaint, coupled with the unique pleading presumption applicable to respondeat superior claims, precludes a finding at the pleading stage of this case that, as a matter of law, the rape was outside the scope of Martin's employment."). These procedural considerations are not relevant in federal court. In a federal diversity action, the court applies state substantive law and federal procedural law. *See Transamerica Premier Life Ins. Co. v. Selman & Co., LLC*, 401 F. Supp. 3d 576, 590 (D. Md. 2019) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Leichling v. Honeywell Int'l, Inc.*, 842 F.3d 848, 851 (4th Cir. 2016)). Here, the case is in a different procedural posture and is governed by federal procedure. The court is deciding a Rule 56 motion, and to defeat such a motion, Lett must come forward with evidence creating a genuine of issue of material fact that precludes the entry of

<mark>11</mark>

judgment as a matter of law. Lett provides nothing to the court which demonstrates that her assailant's actions were animated by anything other than a personal motive.[5]

Lett's failure to create a fact issue is not surprising. In *Our Lady of Peace*, the court stated that it was "unlikely" that the assailant's motive was "anything but exclusively evil when he raped" the victim or that "what he did was anything other than a 'marked and unusual' deviation from his employer's business." 832 S.E.2d at 25–26. The court was constrained by "prior precedent" to allow the case to proceed to trial before a fact-finder. *Id.* at 26. A concurring opinion pressed the point further. "It is hard to imagine, however, a set of circumstances under which a rape perpetrated by an employee would not belong firmly in the camp of 'marked and unusual' cases for which the employer bears no legal responsibility. There exists abundant persuasive authority rejecting, as a matter of law, employer liability in comparable circumstances. The plaintiff has not offered a single case to the contrary." *Id.* at 28–29 (McCullough, J., concurring). In a footnote, the concurrence cited several cases from a variety of jurisdictions. *See id.* at 28 n.\*. These cases reinforce the point that an employer cannot be held liable for a sexual assault or battery committed by an employee. *See, e.g.*, *Piedmont Hosp., Inc. v. Palladino*, 580 S.E.2d 215, 218 (Ga. 2003) (When a hospital employee "began manipulating [the surgical patient's] genitals, then he abandoned the hospital's interests and began pursuing his own personal, morally offensive, agenda"); *N.X. v. Cabrini Med. Ctr.*, 765 N.E.2d 844, 847 (N.Y. 2002) ("A sexual assault perpetrated by a hospital employee is not in furtherance of hospital business and is a clear departure from the scope of employment, having been committed for wholly personal motives."); *Regions Bank & Trust v. Stone Cty. Skilled Nursing*

---

[5] Lett argues that there is an issue of fact as to whether Veney went through a general, resort-wide orientation process at Massanutten Resort. (*See* Dkt. No. 66-2.) Considering it is undisputed that Veney received extensive massage-specific training through massage school, the licensure process, and at Massanutten, Veney's failure to attend a general orientation program meant for all employees, not just massage therapists, is not relevant and does not create a material fact issue.

12

*Facility, Inc.*, 49 S.W.3d 107, 115 (Ark. 2001) (certified nursing assistant "was not, by any stretch of the imagination, acting within the scope of his duties as a CNA when he assaulted [a nursing home patient who was a semi-comatose quadriplegic]. Rather, [his] actions were purely personal"). As in these cases, Veney was not acting within the scope of his employment as a massage therapist when he committed the alleged battery of Lett.

### III. CONCLUSION

For these reasons, the court finds that there are no genuine issues of fact as to whether the alleged battery occurred while Veney was performing a job-related service or whether his motive was personal and a marked and unusual deviation from GERM's Spa business. Therefore, GERM is entitled to summary judgment. The court will issue an appropriate order.

Entered: January 24, 2020.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge